UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

--oOo--


| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | U.S. District Court |
| ) | No. 2:15-cr-0268-BLW-1 |
| vs. ) | |
| ) | |
| CRUZ FLECHITA RAMON SOTO, ) | |
| ) | U.S. Court of Appeals |
| Defendant. ) | No. 16-30236 |
| _____) | |


SENTENCING HEARING

October 11, 2016


BEFORE:   THE HONORABLE B. LYNN WINMILL

APPEARANCES:
      For the United States of America:
            NANCY D. COOK
            U.S. ATTORNEY'S OFFICE
            6450 N. Mineral Drive, Suite 210
            Coeur d'Alene, Idaho 83815

      For the Defendant:
            ROBERT R. FISCHER
            FEDERAL DEFENDER'S OFFICE
            10 N Post Street, Suite 700
            Spokane, WA 99201

```
 1                        REPORTER'S INDEX

 2   PROCEEDINGS:                                          PAGE

 3   October 11, 2016 -

 4          Sentencing Hearing............................ 3

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

October 11, 2016                    Coeur d'Alene, Idaho

2                    P R O C E E D I N G S

3                        --oOo--

4

5          THE CLERK:  All rise.  United States District

6   Court for the District of Idaho is now in session.  The

7   Honorable B. Lynn Winmill presiding.

8          THE COURT:  Thank you.  Please be seated.

9          THE CLERK:  The Court will now hear criminal

10  case 15-268, United States of America versus Cruz

11  Flechita Ramon Soto for sentencing.

12         THE COURT:  My apologies, I need just a

13  moment.  For the record, let me note the defendant --

14  I'm having troubles this morning -- or this afternoon.

15         The defendant entered a plea of guilty to

16  Counts I, III, in the criminal forfeiture under the

17  superseding indictment.  The Court ordered a presentence

18  investigation report, which has been provided to Court

19  and to counsel.  The plea agreement in this case

20  contained an agreement to dismiss Count II pursuant to

21  Rule 11(c)(1)(a).  I assume, Ms. Cook, you would make

22  that motion at this time?

23         MS. COOK:  Yes, your Honor.  We would move to

24  dismiss Count II.

25         THE COURT:  All right.  I will find that the

defendant's plea of guilty to Counts I and III

adequately reflect the seriousness of the defendant's

crime and the Court will, therefore, grant the

Government's motion to dismiss Counts II and III and

will accept -- excuse me, Count II and will accept the

plea agreement.  Let me inquire of the defendant.

Mr. Soto, have you had an opportunity to

review the presentence report?

THE DEFENDANT:  Yes, I did.

THE COURT:  And, Mr. Fischer, you've gone over

the report with your client I trust?

MR. FISCHER:  I am, your Honor.

THE COURT:  There were objections filed to the

presentence report, which I'll allow counsel to address;

although, I don't think they really went to the

guideline calculation, but more just to the inclusion of

information in the presentence report from the

statements made by those at the scene and whether or not

that was reliable or not.  It won't affect the Court's

decision, in any event, but if you wish to address that

either by way of evidence or argument, both counsel

certainly can.

I understand that the Government intends --

well, first, let me state that the victim in this matter

is listening in by an audio connection; however, does

1  not intend to make any statements but is simply

2  participating by listening in.

3        Ms. Cook, is that correct?

4        MS. COOK:  We have a recorded DVD statement

5  from Mr. Sayler.

6        THE COURT:  All right.  And you'll submit

7  that?

8        MS. COOK:  We'll play that after the other

9  witnesses have spoken.

10       THE COURT:  All right.  Then you wish to call

11  witnesses.  Are they going to be sworn or just simply

12  address the Court from the lecturn?

13       MS. COOK:  Just address the Court from the

14  lecturn, your Honor.

15       THE COURT:  And, Mr. Fischer, any objection to

16  that?

17       MR. FISCHER:  No, your Honor.

18       THE COURT:  All right.  And let's go ahead and

19  proceed in that fashion.

20       Mr. Fischer?

21       MR. FISCHER:  Yes, your Honor.  And I

22  apologize for this being late, but I also filed a

23  supplement to the response to the presentence

24  investigation report.  It was -- I filed it on

25  October 7th and the reason why I objected to this was it

was pointed out to me by Ms. Shell, our litigation
specialist, previously from United States Probation
Office in Spokane, who is now in our employ, that
paragraph 46 of the PSI indicates in the list as
pending, the Tribal Court charges that are associated
with the instant offense.

Those charges have been dismissed.  The reason
why I would ask that to be -- that the PSR be physically
amended and rewritten to take those -- that paragraph 46
out is because when Mr. Soto gets to prison, he has to
be -- had to go through a security checklist.  And he
could potentially with these charges pending -- which
they're not, they've been dismissed and I provided a
order of dismissal from the Tribal Court on that.

But he could potentially go from a security
level 7 -- it would increase his BOP security level by
seven points.  So instead of being classified as a 12,
he would raise to 19.

In addition, we would ask that the United
States Probation Office under paragraph 84 at page 17
indicate -- which we'll get to the Bureau of Prisons --
indicate that the GED, which I attached as well, that
they -- that it be revised to indicate that the GED
earned on May 19th, 2000, has been verified by the
United States Probation Office.  If that's not verified

by the United States Probation Office and physically
attached to the -- to the -- from my understanding, to
the PSR, then that will increase another two points.  In
other words, Mr. Soto will not be given a two-point
reduction for that GED.  So the result is that he would
be rose from 12 not only to 7 levels, but also could
rise to 19, which would definitely put him in a
different classification when he gets to the Bureau of
Prisons.

In fact, we would be asking that the Court
make a recommendation to the BOP that he be placed at
Sheridan.  If these are not amended, if this PSR is not
amended, he may not have that ability to get there.  He
may be reclassified from low or even medium to a high
security risk.

So I filed that for that purpose, your Honor.

THE COURT:  Ms. Cook, is there any objection
to those changes?

MS. COOK:  I haven't had an opportunity to
check the GED.  I believe that probation will do that
and we have no objection, certainly, to the dismissal of
the tribal charges because they were dismissed.

THE COURT:  All right.  Well, I don't see an
issue.  The defense classification with BOP, I'm frankly
not concerned about that.  That's up to BOP.  And I'm

1 not -- I will do what's factually correct, but I will

2 not try to make the record different from what the

3 reality is to accommodate a classification for the

4 defendant.  But since apparently the State -- or the

5 Tribal Court charges have been resolved or dismissed

6 and, Mr. Urbaniak, you had confirmed that you had

7 received the defendant's GED or certificate?

8           MR. URBANIAK:  Yes, your Honor.

9           THE COURT:  All right.  Then I will grant the

10 motion and the presentence investigation report will be

11 modified to confirm that the charges that were listed, I

12 think, as pending in Tribal Court have, in fact, been

13 dismissed as of I guess almost a year ago.  And in

14 addition that the defendant has, in fact, obtained his

15 GED and directed it be attached to the presentence

16 report as submitted to the Bureau of Prisons.

17           MR. FISCHER:  Thank you, your Honor.

18           THE COURT:  All right.  Ms. Cook, do you want

19 to go ahead and proceed?

20           MS. COOK:  Yes, your Honor.  As you can see,

21 many members of Joe Seyler's family are here and the

22 first person we'd ask to come up is Alene Boom George.

23 The victim in this case's mother and standing beside her

24 is going to be her sister.

25           THE COURT:  All right.  Ms. George, if you

1  want to come forward.

2       MS. GEORGE:  I'm Joseph Seyler's mother, Alene

3  George.  Last name G-E-O-R-G-E.  Also known as Boom.

4  This is my sister, Marie Torosian.  Her last name is

5  spelled T-O-R-O-S-I-A-N.

6       On November 12th, 2015, Cruz Soto made our

7  son, brother, dad, nephew, cousin, friend, Joseph

8  Seyler, his victim, along with many other family members

9  across the states of Idaho, Montana, Washington and

10  Oregon.  Cruz Soto, his senseless actions, has made my

11  life miserable every day since November 12th.  I've sat

12  by Joe 15 days not knowing if he was going to live or

13  die.  I prayed.  I begged the higher powers to do what

14  needed to be done.  We spent 42 days in intensive care

15  unit.  Fifty days in the rehab center.  A total of 92

16  days in Seattle.

17       I was told by the doctors Joe was strong and

18  he fought hard to live.  Yes, Joe lives, but not like

19  the normal person anymore.  Joe is paralyzed from his

20  shoulders down.  In this time away from home we missed

21  Thanksgiving, Christmas and New Years with the families

22  and children.  Joe can only move his head and talk and

23  breathe.  Joe has to have 24/7 care around the clock and

24  can't be left alone.  The time spent in rehab was to

25  teach us how to take care of him and for him to live a

1  new -- to learn to live a new way of life.

2  　　　　Now that Joe's girlfriend of 18 years has left

3  him, it has been up to me to take care of Joe.  I work

4  eight hours a day and then go home and take care of Joe.

5  It takes me two-and-a-half hours to assist Joe with his

6  bowel program and shower.  I don't leave Joe's home

7  until the hours of the night, 1:00, 2:00 o'clock in the

8  morning sometimes.  Then get up and go to work at 7:00

9  in the morning.  I'm tired.  Some days I fall asleep at

10  work.  I don't have time for my husband or grandchildren

11  anymore.  I don't have any time for entertainment

12  because I worry about who's going to be there to take

13  care of Joe.

14  　　　　Cruz has made my life miserable, tiring and my

15  body aches from lifting and turning Joe every day.

16  Eleven of my 20 grandchildren depend on me, and I don't

17  have time for them anymore.  I used to take them

18  shopping, to movies, to the casino to spend the night to

19  swim, to Coeur d'Alene for walks.  Now all my time is

20  spent on Joe.  I don't get to go on Harley rides or boat

21  rides with my husband anymore.

22  　　　　When I get home, my husband is asleep; when I

23  wake in the morning he's gone to work.  We can't find

24  time to spend time with each other anymore.  My

25  six-year-old granddaughter has fears and emotional

problems now and pees her pants every day.  Some days
she comes to me and tells me all about what she heard,
seen, when she is scared her uncle isn't coming home.
School has her in counseling and she is allowed to call
me anytime she gets scared at school.

This whole crime has me falling to pieces
every day having to care for my son and see him in pain
and shame because I have to do everything for him.  Joe
tells me when I'm assisting him with his bowel program,
"Mom, don't look at me in the face because I'm
embarrassed and I hate it because you have do this for
me."

I fall to pieces every day after I am done
taking care of Joe.  I hang on tough not to let him see
me cry because it hurts him, so I have to put on my
tough act and hold my breath.  I wish Cruz Soto had to
think about Joe every time he goes to the bathroom to
pee, a bowel movement, feed himself, scratch his itch,
cough, take a drink, walk, stand up, get dressed, wipe
his butt, shower, blow his nose, brush his teeth, comb
his hair, wipe his tears, think clearly, hug someone,
and when he gets a headache, I wished it was as bad as
Joe's are.  I pray he thinks about what he had done to
Joe because he is unable to do anything for himself
anymore.  My son begged for his life and asked him to

stop.  Now, I wish upon Cruz Soto to receive the maximum

sentence due for his crime.  Cruz Soto sentenced my son

to a life of pain, misery, and wishing he was dead.

             THE COURT:  Thank you, Ms. George.

             MS. COOK:  Next we call Ida Curley.

Mr. Seyler's grandmother.

             THE COURT:  Ms. Curley.

             MS. CURLEY:  My name is Ida Curley.  I am the

grandmother of Joseph Seyler.  And it's very hard to

stand up here.  And just like my daughter said, our

lives have changed.  When he was born, I was there.

When he got to the hospital, I met him there.  I went to

Harbor View, saw him there.  Prayed with him and told

him he's tough, he can make it because our family's

tough and we all stand together.

             And having a grandchild get hurt like that, it

hurts you.  It hurts me to see my daughter suffer.  I

didn't -- I don't -- I used to go with the senior

citizens traveling around and when this happened I

couldn't go.  I couldn't leave my daughter.  If

something happened to Joe it happens to our whole

family.  When one of us gets hurt, we all get hurt.  It

hurts my family from Montana, all over, because we stand

together.

             And I go and see in Joe -- I just want to hold

1   him and make him well, which I can't do.  And it hurts
    2   because growing up we faced things like this, but we
    3   didn't use guns and knives and that.  We did it the old
    4   way, fisticuffs, and it was over.  This new generation,
    5   they don't know what they're doing.  They hurt you.
    6   They ruin your life.  And that's the way I feel because
    7   I can't do what I wanted to do when I got older.

    8          When I lost my husband, he was the pillar of
    9   our family and he was gone.  He's gone now.  And I try
   10   to be -- I try to be tough with my kids and my grandkids
   11   and always be there for them and when Joe had a bad time
   12   sometimes he would end up on my doorstep.  And when I go
   13   and set with him he loved to read and I -- hurts me that
   14   he can't read no more.  He can't do a lot of things.

   15          And first thing when he came to in Harbor View
   16   and I went in to see him, he said, "Gram, when I woke up
   17   I wished I was dead."  He said, "I don't want to live
   18   like this the rest of my life."  I told him, "Joe,
   19   you're a strong boy and God blessed you here for some
   20   reason.  You can work and you can work hard and we pray
   21   and we pray every day that you will one day walk this
   22   earth again."  And that's what I pray.

   23          And, you know, I try not to have hate in my
   24   heart.  I pray to God all the time.  And I don't want to
   25   hate nobody for what -- and I just told Joe, you know,

we can't live with hate.  And if you live with hate then
where do we end up?  Just as bad as the person that hurt
you.  And I just want him to know how our whole family
suffers, not only Joe.  We are all there with him.
Everything that happens to him happens to us because we
are a family that stands together.

Thank you.

THE COURT:  All right.  Thank you, Ms. Curley.

MS. COOK:  At this time Gari LeSarte.
Mr. Seyler's sister.

THE COURT:  Ms. LeSarte, if you want to come
forward.

MS. COOK:  She changed her mind, your Honor.

THE COURT:  All right.

MS. COOK:  Leland Dusty Seyler.  Joe's father.

THE COURT:  Mr. Seyler.

MR. LELAND SEYLER:  Yes, your Honor.  I'm
Leland Seyler from DeSmet, Idaho.  I was 25 years old
when I got in my accident and I was a passenger on a
motorcycle.  It left me paralyzed from my hips down and
within the year I lost everything I had; my home, my
wife, everything.

And what my son lost was -- well, maybe I'm at
a level 12; well, they jumped him all the way to a level
20.  And what I'm trying to say is that for somebody to

do something -- I remember my son carrying his daughter
on his shoulders all the time walking with her and he
was always with her all the time.  That was his little
princess.  And he can't walk with her on his shoulders
no more.

And he was always reading to her all of the
time.  She would want him to read.  And no matter what
book she'd bring, he'd read.  No matter how many times
he read it, he would read it to her again.  And he can't
do that no more.  What my son lost is unsurmountable to
even what I lost.  And the difference in what they're
asking for I don't think should be even considered to
any court system or reconciling system.

Your Honor, I wanted to say a lot more but I
really can't.  I'm sorry.  Thank you.

THE COURT:  Thank you, Mr. Seyler.

MS. COOK:  Your Honor, at this time we'd like
to play the video from Mr. Seyler, the victim in this
case.

THE COURT:  All right.

(Playing video.)

MR. SEYLER:  I'm Joseph Seyler, a victim of
Cruz Soto.  I would just like to say --

MS. COOK:  How do you -- what happened?

MR. SEYLER:  I was drinking with Kathy up at

```
 1  Ina's house, and I ended up passing out on the couch and

 2  I all of a sudden started getting shot.  And I got a

 3  bullet in the head and all I could taste was, like, the

 4  bullet from the gun smoke, lead.  And I'm laying on the

 5  ground bleeding and I asked Cruz, you know, to stop.  He

 6  already shot me in the head.  You know, I started

 7  talking about my family, my kids, my girlfriend.  And,

 8  yeah, he ended up shooting me two more times.  That was

 9  basically one of the last things I remember.

10          MS. COOK:  What happened?  What was the result

11  of the gunshot wounds?

12          MR. SEYLER:  I got paralyzed from the neck

13  down.  Got somebody else's bone and tissue in my neck.

14  Lost --

15          MS. COOK:  Could you talk after the shooting?

16          MR. SEYLER:  No, I had to do seven months of

17  speech therapy.  I would forget what I was talking

18  about.  Forget my friends' names.  Yeah, it was really

19  tough.  It was hard.

20          MS. COOK:  How many -- do you remember when

21  you got out of the hospital after the shooting?

22          MR. SEYLER:  Like seven and a half months and

23  then I spent three and a half months in St. Luke's.

24          MS. COOK:  How many times have you been back

25  to the hospital since you were released?
```

1          MR. SEYLER:  At least five or six times.

2          MS. COOK:  Are they all (inaudible) from the

3    shooting?

4          MR. SEYLER:  Yep.

5          MS. COOK:  Could you tell the Court a little

6    bit about your life before the shooting?

7          MR. SEYLER:  Before the shooting, I was able

8    to go hunting, fishing with my brother and son.  Able to

9    show my son how to hunt, follow blood trails, how to

10   respect animals that he killed and I would be able to

11   pick up my daughter.

12         MS. COOK:  Were you working?

13         MR. SEYLER:  Yeah.

14         MS. COOK:  And tell us about your children.

15         MR. SEYLER:  My daughter, she's (inaudible)

16   years old.  It's pretty tough on her.  She tells me

17   every day she wishes I could walk and pack her and hold

18   her.  My son, he's pretty upset.  He goes through a lot.

19   We did a lot.  Played basketball, hunt, fish.  Can't go

20   camping or rafting no more.  Can't play basketball

21   anymore, just nothing.

22         MS. COOK:  Are you in pain?

23         MR. SEYLER:  (Inaudible).

24         MS. COOK:  Now, prior to this accident --

25   excuse me, the shooting -- not an accident -- were you

1   involved in a relationship with someone?

2          MR. SEYLER:  Leia Mcjoe for 17 years.

3          MS. COOK:  Are you still in a relationship

4   with her?

5          MR. SEYLER:  No, we split up due to -- just --

6   just tough on both of us.  Transition from everything

7   from me walking, to a wheelchair, coming back from the

8   hospital.  Leia didn't train on how to take care of me.

9   There was a lot on her, a lot on me.

10         She went from, you know, brushing my teeth,

11  flossing my teeth, cutting my hair, shaving me, helping

12  me with my bowel program, cooking, cleaning the house,

13  taking care of our four-year-old daughter, keeping my

14  17-year-old son in line, grocery shopping.  And probably

15  about five to six months of that there was a lot of

16  resentment between us.  A lot of arguments.  And, yeah,

17  we ended up splitting up.

18         MS. COOK:  Can you do anything for yourself?

19         MR. SEYLER:  Basically blowing in a little

20  tube like this to go from one place to another.  That's

21  about it.

22         MS. COOK:  Can you describe for the Court what

23  your day consists of?

24         MR. SEYLER:  Waking up, laying there.  Yelling

25  for someone to help me.  Asking for someone to help me.

1    Eating breakfast.  Getting lifted up in a hoyer.

2    Getting put in a commode chair for the commode chair,

3    get rolled into (inaudible).  And then from there my mom

4    or Leia would help me do a bowel program because I don't

5    have the stomach muscles to have a bowel movement, so my

6    family has to help me.

7         And then from there take a shower -- well, my

8    family helps me shower, cleaning me, dry me off.

9    Brushing my teeth, flossing my teeth, shaving me.

10   Whatever I need done.  Clipping my nails for me.

11        And then from there it's either -- if I have

12   wounds from, you know, (inaudible) turned or, you know,

13   bed sores or something like that, my mom has -- my mom

14   or Leia or someone has to do my wound care.  That's

15   about a good two hours of, you know, just getting ready.

16   And then from there go to my chair or my bed and then go

17   in the living room and sit there and watch -- watch my

18   daughter play, talk to my son, sit out on the porch.

19   That's about it.

20        MS. COOK:  Can you tell us about your

21   emotional (inaudible)?  How you feel emotionally about

22   what has happened?

23        MR. SEYLER:  When I first woke up after the

24   shooting I basically wished I was dead for, like, two

25   weeks.  Just wished I wasn't alive because I felt

1    helpless, useless, like, I can't do nothing for myself.

2          MS. COOK:  Do you have to take antidepressant

3    medicines?

4          MR. SEYLER:  Yep, yep, every day.

5          MS. COOK:  Do you ever -- what do you think of

6    your outlook?  What do you think your future holds for

7    you?

8          MR. SEYLER:  My family, basically.  I'm

9    just like this for the rest of my life.

10         MS. COOK:  Taking care of you, you mean?

11         MR. SEYLER:  Yeah, my family taking care of

12   me, looking over me and helping me, and -- yeah.

13         MS. COOK:  What do you want the judge to know

14   about your recommendation for Cruz Soto sentencing?

15         MR. SEYLER:  I want as large as possible, man.

16   You know, I was begging for my life and talking about my

17   kids and my family, my mom, my grandma and everything,

18   and begging for my life, asking him to stop.  With no

19   remorse he picked -- you know, shot me two more times.

20   I went to -- I want the most stiffest -- I don't know,

21   attempted murder and whatever else he can get, man.  I

22   mean, yeah.

23         MS. COOK:  Is there anything else you want the

24   Court to know?

25         MR. SEYLER:  I miss everything I used to do,

man.  Like picking up my daughter, reading to my

daughter, joking around with her, wrestling around with

her.  Wrestling around with my son, playing one-on-one

basketball with my son.  Playing basketball with my

friends.  Coming up to Coeur d'Alene, going to the

beach, playing basketball, playing in Hoopfest.  Working

out.  Going to work.  Helping support my family.

Feeling good about myself.

Going camping, hunting, fishing.  Yeah, it's

-- being able to walk.  Being able to brush my own

teeth, you know.  Being able to go to the bathroom by

myself, privacy.  Just a lot.  There's a lot that I'm

probably leaving out, but, yeah, it's devastated my life

drastically.

MS. COOK:  It's impacted all your family and

friends?

MR. SEYLER:  Oh, yeah.

MS. COOK:  Tell us how.

MR. SEYLER:  I feel like a burden, man, like,

you know, like, they have to do everything for me.  A

lot of time, you know, I take up most of their time

because they're taking care of me.  Yes, I basically

feel like a burden.  You know, they got to sit there and

take care of me.  I have to yell for my 17-year-old son

to come in and push on my chest to help get phlegm out

1   of my throat, so, you know -- I'm choking on my phlegm

2   or I got to be turned, you know.  Every two, three

3   hours, I yell, you know, my son has to come turn me or

4   push on my chest, or give me something to drink or turn

5   on the air conditioner because I'm hot.  Yeah, there's a

6   lot.

7           MS. COOK:  Thank you.

8           MR. SEYLER:  Thank you.

9           (End of video.)

10          THE COURT:  Any further evidence or

11  presentation?

12          MS. COOK:  No, your Honor.  Thank you.

13          THE COURT:  Mr. Fischer, is there anything you

14  want to present before I hear arguments of counsel?

15          MR. FISCHER:  No, your Honor.

16          THE COURT:  All right.  Ms. Cook, I'll hear

17  your arguments and recommendations.

18          MS. COOK:  Thank you, your Honor.

19          First of all, the Government filed a statement

20  of non-objection to the presentence investigation report

21  and the sentence -- the Government filed a sealed

22  sentencing memorandum based upon the personal

23  information contained in there, which is ECF-70.

24          Our office has filed a preliminary order of

25  forfeiture for the firearm, which is ECF-71.  The

presence investigation report and my sentencing
recommendation is 147 to 153 months pursuant to the plea
agreement.

We'd also ask the Court to sentence the
defendant to five years supervised release, which is the
maximum.  No fines should be given to the defendant
because of the amount of restitution that's due and
owing.  A $200 special assessment.  The restitution as
of what I have been able to find out about today is
$1,085,523.70.  And the Court has already moved to --
the Government has moved and the Court has already
dismissed Count II pursuant to the plea agreement.

Your Honor, it's hard to speak after Joe
Seyler because he says it all.  And I will not repeat
everything that I put in the sentencing memorandum, but
I will say a few short things.

The victim Joe Seyler was an able-bodied,
employed father of two on November 11th, 2015.  In the
early morning hours of November 12th, 2015, Joe Seyler's
life was forever changed because he's now a quadriplegic
as a result of the defendant's actions.  The defendant
shot at him four times, hitting him three times.

In that early morning, Joe Seyler was asleep
on the couch at a relative's house.  Around 1:00 a.m.
the defendant knocked on the door where Joe was staying.

Joe and the defendant spoke for 15 to 20 minutes and then the defendant fired the gun that he had brought to the house at Joe severing his spinal cord causing him to be paralyzed from the neck down.

Joe was flown to Kootenai Medical Center where he was interviewed and identified Cruz Soto as his attacker. Once stabilized, Joe was flown to Harbor View Medical Center in Seattle. During the flight to Seattle he had to be resuscitated numerous times.

Once Joe was in the hospital in Seattle it was touch and go for a long time. Joe's mother witnessed the many times he quit breathing and was resuscitated or was immediately rushed into the operating room. Joe was in a medically-induced coma for several weeks to aid his healing.

As Joe stated, he wanted to die when he found out he was paralyzed, but he realized that was selfish. He has two children he loves very much. You heard from him what he misses the most. Joe can no longer take care of his family; instead, he feels like a burden to them. His son has become his partial caretaker.

This crime has forever altered the lives of many people besides Joe. His friends and families mourn the loss of their Joe. I've had the privilege to meet many family members and they miss his laughing, joking

1 and hugging.  The man who was able to hunt, fish, and

2 provide for his family.

3         The Government believes the guideline sentence

4 of 147 to 153 months is not greater than necessary to

5 serve the sentencing goals established under 3553.  The

6 sentence takes into consideration the nature and

7 circumstances of the offense, history and

8 characteristics of the defendant, reflects the

9 seriousness of the offense, promotes respect for law and

10 provides a just punishment, if there can ever be one.

11 This sentence provides an adequate deterrence and

12 protects the public, and a guideline sentence will

13 provide the needed educational and medical care and

14 provide time for making restitution.

15         Thank you, your Honor.

16         THE COURT:  All right.

17         Mr. Fischer?

18         MR. FISCHER:  Thank you, your Honor.  May it

19 please the Court, Counsel, members of Joseph Seyler's

20 family.

21         I think it needs to be pointed out right from

22 the start that Mr. Cruz Soto, who shot Mr. Seyler no

23 doubt, that right from the start he has expressed to me

24 every time I've met him his deep remorse for what

25 happened.  He's expressed to me that -- and you will

1  hear from Mr. Soto, that if he could, he would change

2  everything.  He would take back that night.  If he could

3  he would stand in the shoes of Mr. Seyler.

4          These things that I'm about to say may be

5  difficult for the Seyler family and members that are

6  here today, but I have to say it because this was a

7  recipe for disaster.  In my sentencing memorandum I

8  indicated, your Honor, who was investigated by my

9  investigation team.  I incorporated some of the

10  discovery.  I provided Mr. Seyler's remarks during a

11  interview between himself and Ms. Cook and the FBI agent

12  and what Mr. Seyler provided to them how he recalled or

13  could not recall the evening.

14          And what we have here, your Honor, is the

15  recipe for disaster.  What you have to add in to that

16  recipe, that recipe for tragedy, is:  First, there is a

17  culture on the reservation that throws into an aspect of

18  outsiders versus insiders.  And what this does is for

19  people who have left the reservation and tried to come

20  back or who were not born on the reservation and tried

21  to get into the reservation is Mr. Soto and others who I

22  indicated in my sentencing memorandum.  Like Luwita

23  George (phonetic).

24          This cultural phenomenon adds to animosity

25  among family members or different family members or

1 members who are the outsiders versus insiders. Now, add

2 to that an eye-for-an-eye attitude. As the Government

3 indicated that Mr. Soto was ostracized by many people on

4 the reservation. In fact, in understanding,

5 understanding the family's feelings of anger and how

6 helpless they are and how they miss their son, I

7 understand that, but there is a letter that was part of

8 the Government's material. And to get an eye-for-an-eye

9 attitude and this feeling of ostracizing some people in

10 Plummer, you have to read into the letter of Raven

11 George, the sister of Mr. Seyler, and she expresses the

12 pain and the misery that her family's gone through.

13 Mr. Soto still cannot comprehend that, but the

14 letter goes on to say, "One thing I want out of your

15 sentence, Mr. Soto, will never be. I can't help my

16 feelings and I have to say I want nothing more than to

17 do to you what you've done to my brother so you can feel

18 the life of hell you put him in for the rest of his

19 life. You are a coward, always have been and always

20 will be. Nobody in this community likes you in any way,

21 including most of our family members because you've

22 always been an ugly, mean-hearted, no-spirit type of

23 punk even before you tried to murder my brother."

24 The fire that is being built that's going to

25 fuel the caldron that you put the recipe for disaster in

has already been foaming.  It's already been driven.
Then you also have the alcohol and drugs, which even the
Government in sentencing memorandum indicates that while
it's hard to compare the crime rate of felony offenses
on the reservation as compared to the general
population, we know that alcohol and drugs generally
play a role into the commission of the offenses on the
reservation.  More fuel to the fire.  Then you add the
recipe.  Here it starts with the rape trial of Cruz
Soto.  The alleged victim, David Crowe's girlfriend.
That's where this all begins and it accelerates from
there.

        Leonard Rutledge explained it this way and
very succinctly when asked about the nature of the
tension between Cruz Soto and Joseph Seyler, Rutledge
stated that SiJohn was always messing with Soto and also
stated that David Crowe also had messed with Cruz due to
Cruz alleged raping Crowe's girlfriend, Destiny Allen.
He reported that the shooting and all of this had
stemmed from the alleged rape incident.

        So the retaliation has been escalating ever
since.  He did not know how "Half Pint," Joseph Seyler,
was involved in it.  Mr. Seyler should not have been
involved in it.  This is one of the ironies of this
case.  What happened was is that at some point in time

after Mr. Soto got out of jail in the summer of 2015, he met up with Mr. SiJohn, Crowe, Matthew Peone, and another young man, and Joseph Seyler ran into these guys at Bobby's Bar. That day David Crowe and Mr. Soto got into it.

Why? Because of this building animosity because both David Crowe and Mr. Soto were housed in the same jail. Mr. Soto was threatened. He was followed around and he was -- he obtained a firearm for protection.

Now that could have been the most stupid thing he had ever done, other than shooting Joe Seyler, but you have to understand how this kept on building and building. The animosity and the fear that Mr. Soto felt. Was it enough to go to trial on?

THE COURT: Let me ask you just -- there's some aspects to this that are, when I read the presentence report -- I may want Ms. Cook to comment on this as well.

It is clear that Mr. Seyler was at the residence and Mr. Soto came to that residence, correct?

MR. FISCHER: Correct.

THE COURT: And he came with a gun in his possession?

MR. FISCHER: Yes.

1          THE COURT:  And Mr. Seyler was not armed?

2          MR. FISCHER:  He was not armed.

3          THE COURT:  And, of course, we don't know what

4   was said, but Mr. Seyler was there first; Mr. Soto came

5   on the scene.

6          Now, the thing that I'm not -- I haven't quite

7   figured out and I was trying to see if I could find a

8   reference in the presentence report, but I think

9   Mr. Seyler made some comment to the effect that his

10  recollection was he was shot in the face and then while

11  he was laying on the ground he was shot again.  Were

12  the -- does the forensic evidence indicate that the

13  shots happened somewhat in that sequence?  In other

14  words, were there entry wounds from the back as opposed

15  to the front?  Do we know?

16         MS. COOK:  No, your Honor, we don't.  We just

17  know that there were four shots and three of them hit

18  Joe Seyler.

19         THE COURT:  Well, where an entry wound was

20  shouldn't be too hard to figure out.  You don't have

21  anything that would indicate whether the entry wound was

22  in the front or the back of the chest wounds?

23         MR. FISCHER:  I think the medical records

24  represent that, your Honor.

25         THE COURT:  What do they show us, Mr. Fischer?

MR. FISCHER:  He was shot from the back.  He was shot in the back -- two shots in the back and one across the face.  So his -- one of the shots fractured his vertebrae.

THE COURT:  I understand.  Okay.  So apparently it's undisputed that -- I'm sorry, Mr. Soto, I can't -- you know, if Counsel wants to talk to you they can bring something to our attention.  But I don't think I can properly take comments now.

Let me explain my concern, Mr. Fischer.  Ms. Cook, I'll give you a chance to respond to this.

You've portrayed, you know, this powder keg ready to explode, but that may all well be true, but it appears Mr. Seyler was at the residence, presumably minding his own business.  I don't think you indicated he was involved in whatever confrontation had occurred earlier, but maybe he was.  Doesn't really change the analysis.  That Mr. Soto came -- they were both apparently drunk.  Mr. Soto comes into the residence with a loaded gun.  Mr. Seyler is not armed.  Either he shoots -- one of two scenarios is suggesting itself to me.

One is as I think Mr. Seyler was intimating on the video that he was shot in the face, fell to the ground and then was shot twice while he was on the

ground or he was shot in the back.  Neither of those are
very supportive of the argument you're making here
because Mr. Seyler appears to have done nothing to
precipitate this.

Now, I just want to let you know what I'm
thinking --

MR. FISCHER:  Sure.

THE COURT:  -- because in fairness to you and
the Government, under those scenarios it doesn't support
much of the theory you're arguing here and that's why I
need some help.  If you -- why is it important for the
Court to consider the -- almost a feud that was
developing on the reservation here given those
circumstances?

MR. FISCHER:  And I will answer you this way.
First of all, I want to clarify something, your Honor.
Mr. Seyler was involved in when the group --

THE COURT:  Okay.  You're correct about that,
but it doesn't change --

MR. FISCHER:  It doesn't change anything.

THE COURT:  It doesn't change what I'm
suggesting.

MR. FISCHER:  It's not what -- it's not
what -- the argument as Joe Seyler indicated to the FBI
agent and Ms. Cook was, they were arguing over that

1    night that occurred at Bobby's Bar.  That's what he --

2              THE COURT:  The night that what?

3              MR. FISCHER:  At Bobby's Bar.

4              THE COURT:  Okay.

5              MR. FISCHER:  Where Mr. Soto shot the gun in

6    the air while he was in the Jeep.  They went looking for

7    him at Anastasia Morrison's house several days later.

8    Mr. Seyler was part of that group.  Here is a rumor mill

9    that goes around this reservation and things get blown

10   up and blown out of proportion, and then people start

11   thinking there's a hit list and all that stuff.

12             So it's not only what Mr. Seyler was doing,

13   it's not what was in his mind what he didn't do, it's

14   what Mr. Soto was thinking at the time, but nobody will

15   ever know that.  But if you look at the pictures I

16   provided, your Honor, and the Government provided as

17   Exhibit A.  And I looked at this for a long time.  If

18   you look at the Government's Exhibit A, you will see a

19   splitting maul as you enter the house to the left.

20   Mr. Seyler's blood from a serious and almost mortal

21   wounds are right next to that -- very close to that axe.

22             Mr. -- the reason I had Dr. Paul Wert evaluate

23   Mr. Cruz is because I wanted to see what his mind is

24   like when he's drinking or not drinking.  Regardless of

25   whether he's drinking or not drinking, he has a very,

1   very high paranoia type personality.  It's exacerbated

2   by alcohol.  When Mr. Soto walked into the room and they

3   met serendipitously, by chance, did Mr. Cruz Soto see

4   that splitting maul?  Nobody can ever know.  Nobody will

5   ever know.

6         But what other reason would prompt a man to

7   pull out and shoot a man in cold blood other than being

8   paranoid, drunk and being, by chance, a meeting with a

9   person who he knew was running around with his major

10  antagonizers, Crowe, Moffitt and Peone.  Why would he do

11  that?

12        It had to send something -- something in that

13  room had to have happened and nobody knows, but

14  certainly Mr. Cruz -- Mr. Soto has been described as

15  nonconfrontational, even by Mr. Seyler.  Mr. Seyler when

16  he was being interviewed by the agent said he won't

17  fight.  He won't fight me.  He called him -- in fact, he

18  called him a pussy.  Somebody who would rather not

19  confront anybody.

20        And other people described him as well.

21  Anastasia Morrison says he's, like, docile when he's not

22  drinking.  He's like -- he's nonconfrontational.  He'll

23  run from a fight rather than engage in it.  So this is

24  the mystery.  This is one of the many ironies of what

25  happened in that room that night.

So hopefully I've answered your question.  A question that will not be answered by anybody because both men have no recollection, very little recollection. In fact, sometimes -- well, like today, we saw Mr. Seyler say he -- he recalls -- he recalls that he asked Cruz to stop and then he shot two more times.  In the interview -- and this is important for the family to hear too, because in the interview between Mr. Seyler and Ms. Cook and the agent, he indicated -- and it was asked, "Do you recall Cruz saying anything before, during or after the shooting?"  And Joe Seyler said, "Huh-uh."  He didn't even know it.  I provided that tape.

This -- and the other irony is is that although all these men have criminal histories and they all are against one another, or a group is against another group or one man; the other irony is that Mr. Seyler was the very fewest of his concerns.

His concerns were the others; not Mr. Seyler. So that is what is so mind-boggling about this case. That nobody can look into either man and nobody can find out any answers because of both of them were such -- so impaired.  But yet when you look at the room -- and it's not unheard of because my office has defended many, many cases on reservations -- Spokane, Coeur d'Alene -- where

people have used shovels, axes, screwdrivers, to maim
and kill and injure other American Indians.  So when you
look at this boiling pot that overflowed and the tragedy
that occurred -- and another thing is, your Honor, you
know, this man has got to live with this for the rest of
his life.

Just like Mr. Seyler's got to live with his
life.  This man's going to go to prison.  He's going to
go to prison for a long time.  This man needs treatment
and help.  Mr. Seyler needs treatment and help.  My idea
is this -- and I don't know if the Seyler family is open
to it or not, but Mr. Cruz Soto brought this up to me.

"If I get out of prison and when I get out of
prison, what would the family say if I went to Mr. Joe
Seyler and tried to help him.  Tried to be his
caregiver.  Tried to see him.  I wonder if he would be
open to that."

And I said, "I don't know."  I think, like,
Eileen George indicated -- or, I'm sorry, Ida Curley,
the grandmother, she says not to hate.  She says she
doesn't want the violence.

Mr. Soto doesn't want the hate.  He doesn't
want violence anymore.  He wants to go out -- and the
second alternative he said, "If the Seyler family would
not allow me to do that, would the judge allow me to go

to places where quadriplegics and other people like that
are hospitalized and I could help them?"

Now, maybe some family members don't think
that's important; other family members may.  But the
result of this is that both men from that night and from
the circumstances that built up into this tragedy are
now suffering the consequences of that horrible night.

For recommendations, your Honor, and I know
the -- in my sentencing memorandum I addressed the
presentence investigation report as to enhancements.
One of the enhancements was an increase because of the
seriousness of the injury.

Certainly, if this case was just about a fight
that occurred and Mr. Seyler had suffered the
quadriplegic physical injuries he has now.  If it was a
fight and the serious injury would enhance the guideline
under that circumstances, but here we have a ten-year
mandatory minimum that stands in place of that increase.
A ten-year mandatory minimum.  That results in 147 to
153 months.  I don't know after ten years of prison what
an additional 27 to 33 months would do.

People could say that, well, it would protect
the public from Mr. Soto.  Yet, his actions up to this
point in time, while somewhat troubling with
misdemeanors and dismissal of cases the day after he was

arrested, a little troubling.  But it's not a person

that is so crazy, so nuts, so vicious, so mean, so --

such -- such a bad and horrible person that he should --

his -- that increase should occur in the face of the

mandatory ten years.

That same holds true for a suggestion that his

criminal history is deficient.  He has no felonies.

He's never had a felony.  He's had misdemeanors and

they've all had to do with his alcoholism and drugs.

It's rampant on the reservation and it's rampant in --

rampant in Mr. Cruz Soto and it was rampant in Joe

Seyler who had methamphetamine and alcohol in his

system.

That's the problem.  That's the reality.  But

again the irony is that nobody will ever know what was

in either of these two men's minds and that's another

tragedy.

I would ask that Mr. Soto be placed at

Sheridan.  A recommendation.  Five years of supervised

release.  Ten years of custody.  Time served since his

arrest -- credit for time served since his arrest of

November 12th, 2015.

Thank you.

THE COURT:  Thank you.

Ms. Cook, is there anything on the issues we

discussed that you wanted to add before?

MS. COOK:  Yes, your Honor.

THE COURT:  Very briefly, if you would.  I
don't want to get this going back and forth.

MS. COOK:  I understand, your Honor.  I would
like to just respond briefly to a few of the things.
One of them had to do with the order of the shots.
Mr. Seyler recalls and the evidence seems to
substantiate that he was shot first in the head and then
in the back with the other shots -- two shots.  And I
would just like to comment that there is absolutely no
evidence that Joe Seyler ever went for a weapon.  He was
on the brown couch the furthest from where the axe is.

MR. FISCHER:  I agree.

THE COURT:  All right.

MS. COOK:  And there's nothing to indicate
that this is self-defense in any way.

THE COURT:  Okay.  Mr. Fischer, I always give
defense counsel last word on sentencing if you want to
add.

MR. FISCHER:  No, your Honor.

THE COURT:  All right.  Mr. Soto, is there
anything you want to say on your own behalf?

THE DEFENDANT:  Yes.  First off, I would like
to apologize, you know, for this and for -- to Joe.  I

want to apologize to his mother for everything that she

has to do for him. And I didn't realize the extent of

everything. You know, I try to -- I try to imagine what

it would be like to be paralyzed from the neck down, but

I didn't quite get the concept until I had a chance to

read her letter and hear what she had to say, you know,

not only emotional but physical pain for both of them,

you know. Being that said, you know, I'm -- I'm

definitely going to have to think about this for the

rest of my life. And any problems I think I may have

with my -- in my life or something will never compare

with what Joe Seyler is going through every day and his

family and his mother.

You know, like Mr. Fischer said, I wish I

could take it back and trade places with him, you know,

but I can't now. You know, like Mr. Fischer said, it

escalated to a lot of stuff that happened during the

summer previously, you know, with the fight with

Mr. Crowe (inaudible) rape of his girlfriend and, you

know, them showing up in the bar and then them looking

for me, you know. And I wish I could remember more what

happened that night and I can't say, you know.

The only thing I can think of is I was

overwhelmed with, like, fear and emotion. You know,

before all this happened, too, I moved away and stayed

in Coeur d'Alene, you know, to get away from it. And then, I mean, there wouldn't be a time where I would go down and visit, but even at that I would feel like I had to drink to take the edge off and everything, you know, with everything that's been going on, you know, receiving death threats on my phone.

I can't pinpoint who it was. It was always anonymous. Like Mr. Fischer said, too, like, Joe was the least of my worries out of the whole bunch and like I said I wish I could take it back. You know, there won't be a day I'm not going to -- not think about this and I'm not trying to make any excuses to get away from any of this. I will accept my responsibility, do my prison time. Whatever you give me. And hopefully in there I can take advantage of, you know, treatment and counseling, you know, so tragedies like this will be prevented in the future.

I believe that's all I have to say.

THE COURT: All right. Thank you.

THE DEFENDANT: Thank you.

THE COURT: We may have covered this, I don't recall, but I see the Government would move for the third level for acceptance?

MS. COOK: Your Honor, we -- yes.

THE COURT: All right. And I'll grant that

motion, but it's already taken into account.

The guideline range in this case then becomes -- I'm trying to do the math in my head -- 27 to 33 months, I believe.  But with the ten-year mandatory minimum on the, was it Count III, the firearm enhancement, the guideline range becomes 147 to 153 months.

I'm going to adopt the presentence report as my own findings in this matter and overrule the stated objection to the presentence report, which had to do with reference to statements made by individuals who were present at the scene, but did not -- but were not in the room at the time that the incident happened.  It didn't have any effect on the guidelines.  And the probation office was simply doing what they needed to do, which was report on whatever information they could provide.

I think there was enough evidence there to support, perhaps, a finding of by preponderance of the evidence that these individuals were testifying accurately to what they perceived, but their opportunity for perception was very limited since they weren't in the room and they could only just hear comments and statements being made, so I will overrule the objections to the presentence report.

Turning to the nature and circumstances of the

offense, the offense involved the defendant shooting

Mr. Seyler three times in the neck and upper chest area.

As a consequence, Mr. Seyler now is a quadriplegic.  I

think -- I guess, in addition, I would point out that

with regard to the defendant's history and

characteristics, Mr. Soto was 34 years old.  He's never

been married, but has three children from three separate

relationships.  He's completed his GED and has attended

some college.

          He was last employed in 2014 when he worked

for Green Earth Books in Portland, Oregon.

Psychological evaluation has been completed.  And

according to that evaluation, Mr. Soto suffers from

alcohol -- severe alcohol dependence, opioid dependence,

cannabis abuse, adjustment disorder with mixed dysthymia

and anxiety and differentiated somatoform disorder and a

personality disorder with depressive paranoid and

antisocial personality features.

          The defendant has significant paranoid trends,

which at times may approach delusional levels, which he

may be hypervigilant and may well misinterpret his

environment, assigning malevolent intent to neutral or

benign actions or statements of others.

          The defendant has struggled with addiction

throughout his life.  I don't think I need to go into
details of that.

He also was intoxicated on the night in
question.  He has two driving under the influence and
three possession of controlled substance offenses, but
his criminal history category does not capture much of
his prior criminal record because his convictions by and
large were in Tribal Court rather than in State or
Federal Court.

Let me -- turning to the 3553(a)(2) factors,
this might be the best way to express my overall views
of this case.  The Court is required to impose a
sentence, which is sufficient but not greater than
necessary to reflect the seriousness of the offense and
with respect for the law provide just punishment,
adequate deterrence, protection of the public and any
needed training, care or correctional treatment.

I guess starting with the last of those items,
it's clear that the defendant is in terrible need,
critical need of substance abuse and mental health
treatment.  And obviously that can and will be provided
both in by the Bureau of Prisons and during periods of
supervised release.

Turning to protection of the public.  I -- I
was troubled by, to some extent, the argument that

somehow because this arose on the Reservation where
there is rampant drug and alcohol abuse -- and I'm kind
of quoting Mr. Fischer's words here -- and this kind of
a blood feud that had developed, that somehow that
places a context about what happened here that would
justify a lesser sentence. I guess, I disagree.

I think individuals, whether they reside on
the Reservation or they reside in downtown Coeur d'Alene
or they reside in Spokane or wherever they reside, they
are no less entitled to protection of the law. And I'm
not sure that's not what Mr. Fischer was intimating by
that, but I think it becomes a little too simple to just
argue that if a crime occurs within an environment in
which perhaps drug and alcohol have become a problem,
then somehow we should look at the case differently.

My concern is that -- I sometimes do this as a
mental exercise. I ask myself what if Joe Seyler
instead of being, you know, drunk on the night in
question instead of whatever. What if he was a banker
or lawyer walking down the street and is confronted by
someone shot and left as a quadriplegic. How would
society react to that? In my view, society should react
no less in the situation of Joe Seyler than it would
anyone else. And I'm worried sometimes that we start
looking at cases differently when we shouldn't.

We should treat every individual the same. They're entitled to protection of the law. They're entitled to an assurance that all people are going to be treated the same. Whether they're Cruz Soto or Joe Seyler or a legislator or a member of Congress, it shouldn't matter. The law has to be the same for everyone.

And so I think when we talk about protection of the public, this is a case that I think there -- and I frankly go through another mental exercise before I even look at the guideline range. I look at the facts of the case and ask myself, What does my internal sense of justice tell me would be an appropriate sentence? And I will tell you, my thought was 15 years.

Based upon, you know, I've been a federal judge 21 years and 28 going on 29 years total on the bench, so I've seen a lot of cases. And it just strikes me that when I looked at the presentence report and then turn to the guideline calculation, that the guideline really was not adequate. It has nothing to do with the people here in the audience. It has nothing to do -- I would do the same thing if it was Mr. Soto's family here instead of Mr. Seyler's family.

Another factor that I guess I found very troubling is things that I was pointing to. The fact

1    that it appears that what happened was Mr. Seyler was

2    shot in the neck or in the face in some fashion, which

3    obviously would have immediately taken him to the

4    ground, and then two shots were shot at him while he was

5    laying on the ground.  That's the best I can make of

6    what happened here.  And that's troubling because it

7    shows an intent on Mr. Soto, obviously influenced by

8    alcohol, but still not an effort to protect himself but

9    to do harm.

10           I also think the criminal history category is

11   understated, as suggested.  And, in fact, the guidelines

12   section 4481.21 authorize the Court to do an upward

13   departure.  And I think this based upon the tribal

14   convictions which aren't counted; I think there are two

15   drug charges and a DUI on the reservation that was not

16   counted in the criminal history calculation.

17           Guideline section 5K2.2 also authorize the

18   Court to do an upward departure based upon the extent of

19   the injury to the victim.  Now, while I understand the

20   argument that that may be -- or should be trumped by the

21   fact that there's a ten-year mandatory consecutive

22   minimum sentence of ten years, it doesn't change the

23   fact that the base offense level of having 27 to 33

24   months on Count I really is completely inadequate to

25   reflect the seriousness of what occurred here.

```
 1          And for that reason, again, I think the --
 2    frankly, the guideline range just doesn't capture what
 3    is a fair and just sentence.  It doesn't capture what is
 4    necessary to deter others from engaging in this type of
 5    conduct.  It isn't adequate to protect the public.  And
 6    by "the public," I mean, everyone in this country from
 7    all walks of life.
 8          And so based upon that, I find very persuasive
 9    the recommendation of the probation office in this
10    matter.  So after considering all of those factors, I
11    will impose the following sentence, which I find to be
12    reasonable, just, and sufficient but not greater than
13    necessary to accomplish the objectives of 18 U.S. Code
14    Section 3553(a)(2).  Mr. Soto, if you'll stand, I'll
15    pronounce sentence.
16          The defendant, Cruz Soto, having pled guilty
17    to Counts I and III of the superseding indictment and
18    the Court being satisfied that you are guilty as
19    charged, I hereby order and adjudge as follows:
20          Pursuant to the Sentencing Reform Act of 1984,
21    it is the judgment of the Court that you be committed to
22    the custody of Bureau of Prisons for a term of 60 months
23    on Count I and a term of 120 months on Count III.  All
24    to be serve consecutively.
25          It's further ordered that you pay to the
```

1   United States a special assessment of $200, which will

2   be due immediately.  The Court finds you do not have the

3   ability to pay a fine; accordingly, the fine will be

4   waived in this matter.

5        It's further ordered that you make restitution

6   to the Clerk of Court to be paid for the benefit of

7   Joseph Seyler.

8        Is the amount of $1,085,523.70, is that

9   disputed, Mr. Fischer?

10       MR. FISCHER:  Well, your Honor, I just got

11  this information just a couple of days ago.  I haven't

12  even been able to look at it.  I haven't gone over it

13  with Mr. Soto.  I mean, I --

14       THE COURT:  All right.  Well, the Court I

15  think has the authority to retain jurisdiction on the

16  restitution amount for 90 days.

17       MR. FISCHER:  Yes.

18       THE COURT:  I'm going from memory, but I think

19  that's correct.  So we'll have to schedule another

20  hearing on that issue within the next 90 days if counsel

21  can't resolve it.  I think if you can reach agreement

22  and a stipulation to that effect, there will be no need

23  for another hearing.  I'm going from memory.  I haven't

24  done that in a while, but I think that's what the Court

25  can do.

1          Ms. Cook, is that your understanding?

2          MS. COOK:  Of the 90 days, yes, your Honor.

3          THE COURT:  All right.  Then, Counsel, I will

4    reserve -- the amounts are very substantial and I expect

5    counsel to try to work out an agreement.  If you can't,

6    then we'll schedule another hearing on that issue of

7    restitution.

8          All monetary penalties will be due and payable

9    immediately.  Having considered the defendant's

10   financial resources, I will order payments under the

11   following schedule while in custody.  Mr. Soto, you will

12   submit nominal payments of not less than $25 per quarter

13   through the Bureau of Prisons Inmate Financial

14   Responsibility Program.  And during the term of

15   supervised released, you will submit nominal monthly

16   payments of 10 percent of your gross income, but not

17   less than $25 per month.  The payment schedule does not

18   preclude collection efforts under 18 U.S. Code Section

19   3613.

20         Upon release from imprisonment, you will be

21   placed on supervised release for a term of five years

22   consisting of three years on Count I and a term of five

23   years on Count III.  All such terms to run concurrently

24   with each other.

25         Within 72 hours of your release from the

custody of the Bureau of Prisons, you will report in

person to the probation office in the district to which

you are released.  Supervised release will be imposed

upon the following terms and conditions.  First, that

you not commit any federal, state, or local crimes.

Second, that you not unlawfully possess any controlled

substances and refrain from any unlawful use of a

controlled substance.  That you submit to an initial

drug test within 15 days of your release on supervision

and to a maximum of five periodic drug tests per month

thereafter for the term of supervision as directed by

your probation officer.

The cost will be paid by both yourself and the

Government based upon your ability to pay.  You will not

possess any firearms, ammunition, destructive devices,

or any other dangerous weapons.  You will cooperate in

the collection of DNA as directed by your probation

officer.  You will pay the special assessment and the

restitution once the amount of restitution has been

determined in accordance with the schedule of payments

as ordered by the Court.

You will also comply with all general and

special terms of supervised release and the standard

conditions of supervision as will be outlined in the

judgment of a criminal case to be filed later in this

```
 1   proceeding.

 2           The defendant will also comply with the

 3   following special conditions of supervision:  You'll be

 4   required to submit your person, property, house,

 5   residence, vehicle, papers, or office to a search

 6   conducted by a U.S. probation officer.  You will warn

 7   other occupants that the premises may be subject to

 8   searches pursuant to this condition.

 9           You will participate in a program of testing

10   and treatment for drug and alcohol abuse as directed by

11   your probation officer with the costs to be paid by both

12   yourself and the Government based upon your ability to

13   pay.

14           You will abstain from the use of alcohol and

15   not be present in any location where alcohol is the

16   primary item of sale.  You'll participate in a program

17   of mental health treatment as directed by your probation

18   officer with the cost to be paid by both yourself and

19   the Government based upon your ability to pay.

20           You will provide your probation officer with

21   access to any requested financial information and you

22   will not incur any new indebtedness of any type without

23   the approval of your probation officer unless you are in

24   compliance with the installment payments schedule as

25   adopted by the Court and that may be modified from time
```

1    to time.

2          Do you have any questions about the conditions

3    of supervised release, Mr. Soto?

4          THE DEFENDANT:  No, I don't.

5          THE COURT:  All right.  I would advise you

6    that if you violate the terms of your supervised

7    release, you will be brought back before the Court and a

8    further sentence of incarceration imposed.  I would also

9    advise you that a defendant typically has the right to

10   appeal their conviction or sentence, but you have signed

11   a plea agreement which includes a provision waiving some

12   or all of those rights.

13         In fact, it waives almost all of the rights

14   with just a few exceptions.  Such waivers are generally

15   enforceable, but you may argue to the contrary.  If you

16   do wish to pursue an appeal either to challenge the

17   waiver of your appeal rights or to appeal an issue not

18   waived by the terms of your plea agreement, you must

19   file a notice of appeal within 14 days after judgment is

20   entered in your case.

21         If unable to pay the cost of an appeal you may

22   apply for leave to appeal in form of paupers.  If you so

23   request and qualify, the Clerk of the Court will arrange

24   for legal representation and will prepare and file a

25   notice of appeal on your behalf.

I would indicate that you have agreed to the
forfeiture allegations in the indictment and accordingly
the property identified in the plea agreement and the
preliminary order of forfeiture will now be deemed
forfeited and a final order of forfeiture will issue.  I
will recommend to the Bureau of Prisons that you receive
credit for all time in federal custody.  I will
recommend as a placement of confinement the Sheridan,
Oregon facility of the Bureau of Prisons.

I'll recommend that you be allowed to
participate in the RDAP drug treatment program.
Counsel, is there anything that I -- well, let me first
ask, Mr. Urbaniak, Ms. Bracke, did I overlook anything?

MR. URBANIAK:  No, your Honor.

MS. BRACKE:  No, your Honor.

THE COURT:  Counsel, is there anything else?

MS. COOK:  Not that I'm aware of.  Thank you,
your Honor.

MR. FISCHER:  No, your Honor.  Thank you.

THE COURT:  Now, I'm -- we're running way
behind.  I have a sentencing that was supposed to start
30 minutes ago.  I want to take a minute before I step
down, Mr. Soto.

I was struck by your sincere remorse.  I think
everything you said was absolutely right and I hope,

```
 1   truly hope, that the family of Mr. Seyler will accept
 2   that.  I think the idea of somehow trying to find
 3   redemption through service to others as you've indicated
 4   you want to do, I think is very -- is a very good thing.
 5   And by imposing a sentence longer than the guidelines, I
 6   was not -- I did not want you to take that as an
 7   expression of any ill-will on my part.  It's not that at
 8   all.  It's a matter of doing what I think is just, which
 9   is what I think our society expects and demands.
10        What happened here obviously no one can undo
11   what happened to Joe; you can't undo it, no one can undo
12   it.  But I think when people make horrible mistakes and
13   in your case it wasn't even just a mistake, it was a
14   volitional act, it took away much of his life.  At that
15   point, there has to be a consequence.
16        But I am truly hopeful in response to what
17   Mr. Fischer said that somehow there can be an end to
18   this.  It doesn't help, you know, when there are
19   problems in a community, violence is not an answer.  And
20   somewhere it has to end and I would hope that somehow it
21   would end here as we leave this courtroom today.
22        But I, frankly, wish you the best of luck and
23   more importantly Mr. Seyler and his family as they have
24   to cope with the horrible tragedy that he's going to
25   face the rest of his life, and wish all of them clearly
```

1  the best of luck and all of, you know, hopefully the

2  strength and the fortitude to not only address those

3  challenges, but also the challenges of the violence that

4  hopefully we can put an end to.

5          The Court will be in recess.

6          THE CLERK:  Court is in recess.

7          (Matter adjourned.)

8          (End of audio file.)

9                  --oOo--

10      I, Valerie Nunemacher, certify that the foregoing

11  pages are a true and correct transcription of the

12  audiotaped proceedings to the best of my ability, except

13  where noted "unintelligible" or "inaudible."

14

15

16  _____

17      Valerie Nunemacher, CSR, CCR, RPR

18

19

20

21

22

23

24

25